# EXHIBIT 1

AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
District of New Jersey

ORIGINAL FILED
MAY 27 2014
WILLIAM T. WALSH, CLERK

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

620 DEER ROAD, SUITE #18,
CHERRY HILL, NEW JERSEY

Case No. 14-MJ-2026 (JS)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.1

located in the ____________ District of New Jersey , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 371; 471; 472; & 473 | Conspiracy; Making Counterfeit Obligations and Securities; Uttering Counterfeit Obligations and Securities; Dealing in Counterfeit Obligations and Securities |

The application is based on these facts:

See Attached Affidavit (Attachment C)

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: __________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

AUSA Kimberly Riley Pedersen

Jenny Contardi
*Applicant's signature*

Jenny Contardi, Special Agent, U.S. Secret Service
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 05/27/2014

Joel Schneider
*Judge's signature*

City and state: Camden, New Jersey

Joel Schneider, U.S. Magistrate Judge
*Printed name and title*

# CONTENTS APPROVED

UNITED STATES ATTORNEY

By: [signature]
Jason M. Richardson, AUSA
Date: May 27, 2014

# ATTACHMENT A.1

**Place to be Searched**

The SUBJECT PREMISES #1 to be searched is 620 DEER ROAD, SUITE #18, CHERRY HILL, NEW JERSEY, which is a suite located on the south side of an industrial warehouse building. The premises is marked Suite #18 on the front exterior glass door. The industrial warehouse building is more fully described as a two-story, brick building with multiple suites in the building.






## ATTACHMENT B

**Particular Things to be Seized**

The items described below that constitute fruits, evidence and instrumentalities of violations of Title 18, United States Code, Sections 471 (Counterfeiting and Forging Obligations of the United States), 472 (Uttering Counterfeit Obligations) and 473 (Dealing in Counterfeit Obligations and Securities), and attempt and conspiracy to commit those offenses, in violation of Title 18, United States Code, Section 371.

1. Paper – shredded, cut, and uncut;
2. Inks, pigments, and dyes;
3. Brushes and rollers;
4. Stencils and screens;
5. Press cleaning supplies;
6. Embossing devices;
7. Gloves;
8. Plate burners;
9. Hot foil stampers and hot foil stamps;
10. Paper cutters and shredders
11. Glitters;
12. Arts & crafts supplies;
13. Thermographic materials;
14. Adhesive;
15. Metal dies;
16. Foils;
17. Lenticular lens sheets – both cut and uncut;
18. Printing press blankets;
19. Counterfeit detection tools;
20. Receipts and invoices relating to the purchase of supplies, such as paper, ink, toner; service of machinery, transportation of good and items to or from 620 Deer Road, Cherry Hill, New Jersey;
21. Documents and printed material related to the making of genuine US currency or the make-up of genuine US currency;
22. Scissors, cutting tools, cutting boards, registration paper, double sided tape, gloves, oven cleaner solutions and products, chemical de-greaser solutions and products, Scotch-Guard products, "Febreze," starch, irons, and similar items;

23. Printing presses and digital printers;
24. Printing plates;
25. Negatives;
26. Cameras;
27. Scanners;
28. Any material bearing the completed or partial image of a Federal Reserve Note;
29. Any material bearing the completed or partial image of a Federal Reserve Seal;
30. Any material bearing the completed or partial image of a Treasury Seal;
31. Any material bearing the completed or partial image of a serial number;
32. Digital images of currency, plates, printing process;
33. Counterfeit United States and foreign currency in various denominations;
34. Genuine United States and foreign currency in various denominations, which may be compared to known counterfeit currencies in an attempt to identify currency which may have been used as "pattern notes" to produce counterfeit currency;
35. Copier paper, linen résumé paper, cotton bond paper, or materials which could be printed on to produce counterfeit currency;
36. Any security related or surveillance devices, to include camera systems, DVR's, hard drives, or any other related electronic devices used for monitoring;
37. Documents relating to the production, sales, or distribution of counterfeit United States currencies;
38. Documents showing occupancy, residency, rental agreements and/or ownership of the property being search described within;
39. Documents, receipts, keys, maps, or personal notes describing locations where genuine and counterfeit currency may have been spent or currently located;
40. All documents constituting or relating to any address book, diary, or calendar, including any book, paper, log, or other item used to record or store names, addresses, telephone numbers, appointments, or events;
41. All documents referring or relating to the location of any cash or funds, including any safe deposit box or keys;
42. Any cellular telephone, pager, or fax machine, and all documents relating thereto, including billing statements, subscriber information, and call detail records;
43. Any computer hardware, including file servers, desktop computers, laptop computers, tablets, mainframe computers; electronic, magnetic or digital storage devices such as hard drives, zip drives, CD-ROMs, floppy disks, and any other electronic media storage device; any internal and external peripheral devices (e.g. printers, scanners) and any of the above listed records, documents or materials which are maintained on computer located at the premises, to include the device, (computer), wherein these records, documents or materials are maintained, for search as detailed in the affidavit;

US-009593

44. Computer passwords and other data security devices necessary to gain access to any computer equipment or electronic storage devices seized during the search;

With reference to the items seized in 42 and 43, they may be searched only for the items described in paragraphs 37 to 41 above.

## ATTACHMENT C

## AFFIDAVIT OF PROBABLE CAUSE

I, Jenny Contardi, Special Agent of the United States Secret Service (USSS), being duly sworn, depose and state that:

## INTRODUCTION

1. I am an "investigative or law enforcement officer" of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Section 2516 of Title 18, United States Code.

3. I have been a Special Agent with the USSS for four years. I am currently assigned to the counterfeit squad in the Philadelphia Field Office. As a Special Agent with the USSS, I have participated in numerous investigations which have led to the arrest and conviction of individuals involved in the counterfeiting of U.S. currency. I have received training and experience in interviewing and interrogation techniques, arrest procedures, preparation of search warrant applications, surveillance techniques, undercover operations, operations involving cooperating sources, analysis of pen register information, review of subpoenaed documents and a variety of other investigative tools available to law enforcement officers. In the course of my training and experience, I have become familiar with the methods and techniques associated with the manufacture, uttering and dealing in counterfeit U.S. currency.

4. The facts set forth in this affidavit are based on my investigation, personal observations, training and experience, as well as information conveyed to me by other law enforcement officials. During this investigation, I have learned information regarding the facts set forth in this affidavit from cooperating sources and from my review of documents and computer records related to this investigation. Because this affidavit is submitted for the purpose of establishing probable cause, it does not include all facts known by me or all facts known by law enforcement authorities concerning this investigation.

5. This affidavit is submitted in support of an application for a search warrant to obtain evidence of the following violations:

a. Title 18, United States Code, Section 471 (making counterfeit obligations and securities);

b. Title 18, United States Code, Section 472 (uttering counterfeit obligations and securities);

c. Title 18, United States Code, Section 473 (dealing in counterfeit obligations or securities);

d. Title 18, United States Code, Section 371 (conspiracy).

6. Based on the government's investigation, there is probable cause to believe that Itzhak LOZ and Ronen FAKIRO, with intent to defraud, have falsely made, forged, counterfeited and altered any obligation and security of the United States, and attempted and conspired to do so, in violation of Title 18, United States Code, Sections 471, 371; with intent to defraud did pass, utter, publish and sell, and with like intent, did bring into the United States and keep in possession and conceal any falsely made, forged, counterfeited and altered obligation and security of the United States, and attempted and conspired to do so, in violation of Title 18, United States Code, Sections 472 and 371; and did buy, sell, exchange, transfer, receive and

deliver any false, forged, counterfeited and altered obligation and security of the United States, with the intent that the same be passed, published, and used as true and genuine, in violation of Title 18, United States Code, Sections 472 and 371 . Based on the information contained in this affidavit, I submit that there is probable cause to believe that evidence, fruits, and instrumentalities of these offenses, as described in Attachment B, will be found in

a. the warehouse to be searched, located at 620 DEER ROAD, SUITE #18, CHERRY HILL, NEW JERSEY (herein referred to as "SUBJECT PREMISES #1)," which was purchased by Itzhak LOZ and Ronen FAKIRO in January 2014;

b. the Extended Stay America hotel, Room 311, located at 101 DIEMER DRIVE, MT. LAUREL, NEW JERSEY (herein referred to as "SUBJECT PREMISES #2)." Room 311 is occupied by Ofra and Boaz BOROHOV, but listed in the name of Itzhak LOZ, and was paid for using the joint Bank of America account shared by LOZ and FAKIRO;

c. A gray Chevrolet Traverse bearing Pennsylvania license plate JCC 9839 (herein referred to as "SUBJECT VEHICLE #1)," which is a rental vehicle, rented in the name of FAKIRO, and driven by Ofra and Boaz BOROHOV.

**STATEMENT OF FACTS SUPPORTING PROBABLE CAUSE**

7. Beginning in and around 1999, the USSS first detected a high-quality counterfeit $100 (U.S.) note in New York, New York. These notes have many counterfeit security features that closely resemble genuine U.S. currency notes, including a watermark and security thread. This particular note is believed to be manufactured in the Euro-Asia area and produced through the use of off-set printing.

8. The USSS estimates that from 1999 until the present, approximately $75 million of this particular type of counterfeit note was passed or seized by law enforcement. The USSS estimates that in 2013 alone, approximately $10.8 million worth of this particular $100 counterfeit note was passed or seized by law enforcement. Over the course of the past year or so, the USSS has been investigating a number of subjects involved in a conspiracy to make, utter and deal in counterfeit U.S. currency, believed to be manufactured in Eastern Europe and imported into New York for distribution throughout the eastern part of the United States. On or about October 8, 2013, the United States Federal Reserve Board issued a re-designed $100 note which contained new and additional security features, including a portrait watermark of Benjamin Franklin, a 3-D blue security thread, an image of a liberty bell in the inkwell, color shifting "100," raised printing, gold ink "100" and microprinting.

9. In February of 2013, and in furtherance of an investigation into the uttering of counterfeit $100 notes that had been passed at various retail stores in Virginia and Maryland, local law enforcement executed a state search warrant for evidence of counterfeit U.S. currency at the residence of two individuals (UCC-1 and UCC-2) in Dale City, Virginia. No counterfeit U.S. currency was found during the execution of the warrant. However, UCC-1 and UCC-2 both gave a voluntary, consensual statement to the USSS. Special Agent Adam Gaab (USSS) advised UCC-1 that he/she was a target of the investigation, but was not under arrest and that he/she did not have to cooperate with law enforcement. UCC-1 agreed to speak and voluntarily provided information to law enforcement during an interview at his/her home and on subsequent occasions.

10. During this consensual, non-custodial interview, UCC-1 indicated that beginning in and around October 2011, he/she began buying counterfeit U.S. currency from Tarrell

JOHNSON in New York and that JOHNSON obtained it from Johnny LEE. UCC-1 further stated that he/she typically traveled to Queens or Hempstead, New York to meet up with JOHNSON to buy the counterfeit notes and that the deals typically occurred on a Saturday morning approximately once per month or whenever JOHNSON had the counterfeit notes available. UCC-1 further stated that LEE obtained the counterfeit notes from "an Arab" in New York.

11. On May 20, 2013, in Freeport, New York, UCC-1, working at the direction and under the supervision of United States Secret Service agents, purchased $10,000 worth of counterfeit U.S. currency from Tarrell JOHNSON. This deal was monitored and recorded. Approximately ten minutes later, surveillance units observed JOHNSON meet with Johnny LEE and do a hand to hand transaction. While law enforcement officers were not able to see what was transferred between the two, agents believe that JOHNSON paid LEE some portion of the money that law enforcement gave to UCC-1 for this controlled purchase.

12. Beginning in and around the end of June 2013, the U.S. Attorney's Office, Eastern District of Virginia, obtained authorization from the United States District Court for the Eastern District of Virginia to intercept wire and electronic communications to and from cellular telephones used by JOHNSON, LEE and later, by their suppliers of counterfeit currency, Eduard and Arkadiy BANGIYEV[1].

---

[1] The telephone call summaries for intercepted telephone calls in this affidavit are based on preliminary summaries and/or preliminary translations of foreign language calls prepared by wiretap monitors/translators. To the extent quotations are used in the descriptions below, the quoted segments are based on "linesheets" (line by line summaries of the content of the calls) and reviews of recordings and not final or certified transcripts. In addition, all dates and times are approximate and based on the monitoring equipment at the time the call was intercepted. Not all relevant calls are described and not all relevant portions of the mentioned calls are described herein.

13. The BANGIYEV brothers are naturalized American citizens from Uzbekistan. Until recently, they owned and operated the Westbury Jewelry Exchange in Westbury, New York. Currently, Arkadiy BANGIYEV purports to be the President of A.K. 47th Street Buyers, which is a storefront in Manhattan's diamond district advertising itself as a "refinery" where gold and silver are bought, scrapped and melted down. In 2008, Arkadiy BANGIYEV was convicted in the United States District Court for the Eastern District of New York for dealing in counterfeit currency, in violation of 18 U.S.C. § 473, and was on supervised release for that offense until early January 2014. Eduard BANGIYEV is also affiliated with A.K. 47th Street Buyers and was arrested in July 2013 by the Pennsylvania State Police for receiving stolen cars, title washing and false application for a title in connection with his ownership of a stolen 2011 Mercedes-Benz. The criminal charges filed against Eduard BANGIYEV are still pending.

14. On November 18, 2013, an incoming call from (972) 544-8433 was intercepted over Arkaidy BANGIYEV's cellphone. The conversation was in English and Russian. During this call, Arkadiy BANGIYEV greeted the caller as follows: "Ah, Alik (or Arik), how are things?" During this call, the unknown male identified as "Alik" or "Arik" replied, "fine, everything ok?" Then, "Alik"/"Arik" asked: "what's going on with our guest? Is he enjoying himself or what?" Arkadiy BANGIYEV's reply was inaudible. "Alik"/"Arik" then stated, "ah, he went to Uzi. In another week, he will owe another twenty thousand to thirty thousand." Arkadiy BANGIYEV replied, "Ah, who gives a shit? Ah, tomorrow he is leaving already." Shortly thereafter, Arkadiy BANGIYEV stated: "I will help him out tomorrow and that's it." "Alik"/"Arik" replied "ok," and then asked "maybe to send the money with Ambal is dangerous too, no?" Arkadiy BANGIYEV replied, "it is very risky…you know, they always fucking…" "Alik"/"Arik" countered: "No, no, no, they always stop and ask questions as well," and then

asked, "did you find somebody?" Arkadiy BANGIYEV answered: "to tell you the truth, found my old phone where I have the numbers, I put it to charge, I did not get a chance to call him. I know that I have the phone number there I will call him. I know the phone number is there I will call him up. I will call him up. I will let you know." "Alik"/"Arik" replied: "ok, because I have didn't tell him any solution yet. I'm busy… [inaudible]…no solution yet." Arkadiy BANGIYEV responded: "we will come up with something, don't worry." "Alik"/"Arik" then stated "tell me something? If I need to wire to the United Kingdom like seventy G's, can you send it to a bank but wire it to an account? Is it a problem? Is the amount too big? To send like to the UK seventy seven thousand dollars to wire it? To the account, is it possible? Is it possible for you to wire it? To the UK?" Arkadiy BANGIYEV replied "no. Oh, this is a problem Alik (or Arik)." Arkadiy BANGIYEV further stated, "the paper work, it is a headache, you don't need that." "Alik"/"Arik" replied "yeah. Ok, ok, so try to find somebody I'm trying to…" Arkadiy BANGIYEV replied "maybe I can find somebody on 47th, maybe they will need something." "Alik"/"Arik" answered back: "yeah, look and see, because this is a problem and I don't know what to do." Arkadiy BANGIYEV said: "don't worry, we will find, everything has a way out. We will figure it out." The assigned case agents (hereafter "the agents") believe that during this call, Arkadiy BANGIYEV and "Alik"/"Arik" discussed the presence of an unknown co-conspirator ("guest") whose identity was known to both of them. They further discussed how to illegally send money out of the United States by concealing the identity of the true owner of the criminal proceeds. First, they discussed sending the money with "Ambal" and whether that would be risky because he would be subject to questioning. Based on information gathered during this investigation, the agents believe that during this call, "Alik"/"Arik" expressed his opinion that having "Ambal" transport genuine U.S. currency out of the United States through

the airport to facilitate the purchase of counterfeit U.S. currency overseas would be dangerous as he could be interrogated about the money at the airport by U.S. Customs and Border Patrol officers. The agents further believe that Arkadiy BANGIYEV suggested that he could find a third party to send money for "Alik"/"Arik" in response to his question about whether he (BANGIYEV) could deposit $70,000 ("70 g's") into a bank account and then wire the money to the United Kingdom ("UK") for him ("Alik"/"Arik"). The agents believe that during this conversation, Arkadiy BANGIYEV expressed his understanding that to deposit cash into a bank account and then to wire the money to a foreign bank account required paperwork, which was a "headache," and that to avoid that process, BANGIYEV would attempt to find another method for moving the money that would not require paperwork, such as a human courier.

15. On November 21, 2013, at 11:09 a.m., an outgoing call to (718) 907-5070 011972544331010 was intercepted over the phone used by Arkadiy BANGIYEV. The agents believe that this was an international call based on the numbers dialed, including "011" and "972," the international country code for Israel. During this call, Arkaidy BANGIYEV spoke to an unidentified male who answered in the affirmative when addressed as "Avi." This call was in English and Russian. The agents have listened to the voice of this speaker and believe it to be the same voice as the speaker previously identified as "Alik"/"Arik" from November 18, 2013. During this call, "Avi" said ""the guy with the 'payots' (side curls) from yesterday. He told me 'is it good? I called you yesterday, you told me tomorrow. I could come pick it up in 40 minutes.' I don't know what to tell him. I wanna make sure, so you know." In response, "Avi" said "yeah, yeah, yeah. I know, I know. I got an hour ago phone call and they told me they will pick it up and they set up with you. So, I assume you will call when you be reached by them. It's o.k. Everything o.k." Arkadiy BANGIYEV asked "so, give it to him, right?" "Avi"

answered, "yeah, yeah, everything is good to do." Then, Arkadiy BANGIYEV said, "Alik, bye; I will call you later.[2] " Then, "Avi"/"Alik" stated, "so, call me up. Let me know after it's been done." Arkadiy BANGIYEV confirmed, "100, yes?" "Avi"/"Alik" said, "yeah, yeah, yea, give him 100, call me up when it will be done" and Arkadiy BANGIYEV said "ok." During this call, agents believe that Arkadiy BANGIYEV called "Avi"/"Alik" in Israel and confirmed that Arkadiy BANGIYEV was expected to give the courier, with whom he just spoke, $100,000 in genuine U.S. currency to facilitate the purchase of a quantity of counterfeit currency. Agents also believe that "Avi"/"Alik" confirmed that Arkadiy BANGIYEV should give the courier the $100,000 and advised him to call him after it was done.

16. On December 14, 2013, an incoming call from (516) 589-4503 was intercepted over the cellphone used by Arkadiy BANGIYEV. During this call, Arkadiy BANGYIEV answered the phone, "yes, Ari." The agents have listened to the voice of the speaker identified in this call as "Ari" and believe it to be the same voice of the speakers previously identified as "Alik"/"Arik" and "Avi" on November 18, 2013 and November 21, 2013. For the reasons to be set forth later in this affidavit, agents believe that this speaker is Itzhak LOZ. During this call, LOZ said "that's ok, buddy, but what happened? Here's only ten?" Arkadiy BANGIYEV explained "Yes, he promised to get me but brought only this. Excusing himself, 'I'm sorry; I'm sorry.'" Then, LOZ asked "ok, tell me something. You know our balance for or you do not know?" Arkadiy BANGIYEV replied "total, I think I paid you, I paid so far 145." Later, during the conversation, LOZ said "ok, you know that I gave you a few packs and I am calculating. You know it." When Arkadiy BANGIYEV said "what?" LOZ re-iterated "I have given you a

---

[2] Based on the fact that BANGIYEV also referred to the speaker in this call as "Alik," agents further believe that this is the same caller who previously called on November 18, 2013. As set forth later in this affidavit, on January 14, 2014, agents identified this telephone number as belonging to Itzhak LOZ.

few packs in fives." Arkaidy BANGIYEV corrected him, "A few times? Only one time." LOZ told Arkadiy BANGIYEV "I will not be here by the end of the month and start of January. Can you organize me 200?" Arkadiy BANGIYEV asked "Can't you bring them with again?" LOZ explained "I need, I need them for . . . no, I need them to fetch the machine." Arkadiy BANGIYEV re-assured LOZ: "Good then, do not worry. I will prepare something. You won't go empty." LOZ continued "No, I need to know because I need to pay them 130 towards something else and I will need 160 over here." Arkaidy BANGIYEV protested "No. How I can get you so much in three weeks? 100 is possible." After some back and forth, LOZ said "I need to know for sure because I cannot bring them with me." Arkadiy BANGIYEV said "No problem. Fly to Israel. We will be in touch." Later, Arkadiy BANGIYEV re-iterated, "when you be in Israel, give me a call." The agents believe that during this conversation, Arkadiy BANGIYEV discussed with LOZ the collection of quantities of genuine U.S. currency and monies owed to one another in connection with their counterfeiting activities. Agents also believe that during this call, LOZ asked Arkadiy BANGIYEV to collect additional money ("can you organize me 200?") in furtherance of their counterfeiting activities. Agents further believe that when LOZ said "I need them to fetch the machine" that LOZ indicated that he needed $200,000 to purchase a machine or machine parts used to print counterfeit U.S. currency, such as an offset printing press.

17. On or about January 6, 2014, LOZ and FAKIRO purchased the SUBJECT PREMISES #1 for approximately $147,683. A review of the purchase records reveal that LOZ and FAKIRO jointly own the SUBJECT PREMISES #1 and that there is no mortgage on the property.

18. On January 12, 2014, at approximately 12:16 p.m., an incoming call from (972) 544-8433 (used by LOZ) was intercepted over the phone used by Arkadiy BANGIYEV. During this call, LOZ stated "yeah, everything is ok. I'll be there in a day after tomorrow. I am coming basically to work with the machine, to check everything." Arkadiy BANGIYEV asked "day after tomorrow?" LOZ replied "yeah, the thing is, I will need some money for payment....consideration, I go through you...for pick up the money." Arkadiy BANGIYEV replied: "I have told you that I am going to give you a hundred." LOZ asked "can you give better? 120-130? Something like?" Arkadiy BANGIYEV said "I have got 100, and I will try to give 20,000 more." Shortly thereafter, LOZ replied "day after flying back to [unclear, but possibly Romania] starting the project. Meantime, my guys will start to glue it, so it should be ready when I come back." Arkadiy BANGIYEV asked "they are starting to glue it?" LOZ answered "yes, they will start, I think this week or (inaudible)....I prepared everything for them." The agents have listened to the voices of the speakers from the November 18, 2013, November 21, 2013, and December 14, 2013 telephone calls and compared it to this caller. The agents believe that all of these calls involve the same speaker, and that the speaker is Itzhak LOZ. The agents believe that during this call, LOZ explained that he (LOZ) was coming to the United States to "basically to work with the machine, to check everything." Previously, on December 14, 2013, LOZ told Arkadiy BANGIYEV that he needed "200" to "fetch the machine." Agents also believe that, during this call, LOZ told Arkaidy BANGIYEV that he was coming to the United States in connection with the purchase of a machine, or machine parts, used to manufacture counterfeit U.S. currency. The agents also believe that LOZ asked Arkadiy BANGIYEV to give him a quantity of genuine U.S. currency ("I will need some money for payment . . . I go through you for pick up the money") either in connection with the purchase of

an off-set printing press and other machines and equipment used to manufacture counterfeit U.S. currency. The agents also believe that Arkadiy BANGIYEV was willing to do such a transaction (i.e., to give $100,000 in genuine U.S. currency to LOZ) to facilitate the printing and manufacturing of counterfeit U.S. currency and reiterated his previous promise from December 14, 2013 to pay LOZ a sum of genuine U.S. currency ("I have told you that I am going to give you 100.") The agents further believe that in this call, when LOZ said "meantime, my guys will start to glue it," he was referring to one of the steps used in the process of manufacturing counterfeit U.S. currency: gluing two pieces of paper together. The agents have spoken with a USSS counterfeit specialist who examined the counterfeit U.S. currency which has been forensically linked to this case. The counterfeit specialist has determined that the counterfeit U.S. currency was glued together during the production process. According to the counterfeit specialist, the seized counterfeit U.S. currency that the BANGIYEV's have distributed during this investigation was also glued together during the production process. The agents further believe that this intercepted conversation between LOZ and Arkadiy BANGIYEV concerned the production of a quantity of counterfeit U.S. currency overseas and the start-up of a production process to produce and manufacture counterfeit U.S. currency in the United States.

19. On January 14, 2014, according to U.S. Customs and Border Protection (CBP) records, Itzhak LOZ, a citizen of Israel born on August 19, 1967, entered the United States from Canada at LaGuardia Airport in New York, along with Ronen FAKIRO, also a citizen of Israel born on July 25, 1968. A subsequent review of a law enforcement database showed that on November 26, 2013, the United States Department of State issued the same Itzhak LOZ a B1/B2 visa (business/pleasure) and on May 11, 2009, issued a B1/B2 (business/pleasure) to the same Ronen FAKIRO.

20. On January 14, 2014, an online search of the "Facebook" website for telephone number 011 972 544 8433 revealed that this number was displayed on the "Facebook" profile of Itzhak LOZ. A further review of LOZ's "Facebook" profile page showed that he was "friends" with Eddie BANGIYEV. A photograph of Eduard BANGIYEV (a/k/a Eddie) and his wife was displayed on LOZ's Facebook profile page. I am familiar with known photographs of Eduard BANGIYEV, including his driver's license photo, and I believe this person depicted on LOZ's "Facebook" profile page is Eduard BANGIYEV.

21. On January 19, 2014, in Cherry Hill, New Jersey, Itzhak LOZ entered into a long term lease with Avis/Budget Rent a Car company for a brown Ford Edge, VIN # 2FMDK4KC8DBC55151 and bearing New York license plate number GJA 2229. LOZ provided a date of birth of August 19, 1967, and a local address of 620 Deer Road, Apt. 18, Cherry Hill, New Jersey (SUBJECT PREMISES #1). According to the rental records, LOZ provided a French driver's license with his name and provided a credit card number which was issued from the Bank of Israel.

22. On February 3, 2014, USSS agents obtained a pen register and a search warrant from Magistrate Judge Theresa Buchanan, United States District Court, Eastern District of Virginia, to obtain location based services information for (516) 384-4013 (the new cellphone number bearing the same IMEI number as (516) 589-4503, the cellphone number previously used by LOZ). After reviewing the location based services data for (516) 384-4013, the USSS determined that LOZ's new cellphone was located in or around the Cherry Hill, New Jersey area. Thereafter, USSS agents began to conduct surveillance in the Cherry Hill area in an attempt to locate LOZ.

23. On or about February 6, 2014, in New York, New York, a local television news channel broadcast a story in response to a press release from the USSS warning banks, merchants and consumers to be on the lookout for counterfeit $100 notes, especially those bearing the numbers "77" on the back bottom corner of the bill.

24. On February 16, 2014, an outgoing call to (718) 887-0970-011972544843310, which was believed to be an international telephone call, a phone used by Itzhak LOZ, was intercepted over the cellular telephone used by Eduard BANGIYEV. The monitors were able to determine from voice recognition that this telephone was used by LOZ. During this intercepted conversation, monitors familiar with their voices determined that Arkadiy BANGIYEV was using his brother Eduard's cellphone. During this call, Arkadiy BANGIYEV asked "everything alright. Working?" LOZ replied "yes yes, starting now." Arkadiy BANGIYEV then stated: "Listen to me, there is a big problem Avi. I told you about the two sevens." LOZ replied "Yes, look to change them now it would be a big problem, I don't have many left." Arkadiy BANGIYEV replied "Here on the news everywhere broadcasted, if you have seven call this that." LOZ replied "I don't have many left. All that's left in day two, I have a new one coming. New material, you know, it's different. You know all that's left 20 percent for checking to see how it will be or won't be. Fifteen I'll charge." Shortly thereafter, Arkadiy BANGIYEV stated "did you get your product? New machine?" LOZ replied "Yes, yes, now need to release from Customs." The agents believe that during this call, when LOZ said "yes, starting now," he was referring to assembling the printing equipment to produce counterfeit U.S. currency. The agents further believe that when LOZ and Arkadiy BANGIYEV discussed the "two sevens" (77), and that they referring to the serial numbers on the reverse side of the counterfeit $100 bill that they distributed. The agents also believe that during this call, Arkadiy BANGIYEV discussed with

LOZ the recent news broadcast of the USSS warning about the existence of counterfeit U.S. currency with "77" on them. LOZ's response that he did not have many of "that kind" left was a reference to the older style $100 bill with "77" on them and his statement that he had a "new one" coming was a reference to the fact that he was working on counterfeiting the newly issued $100 note. The agents further believe, based on LOZ's statement that he was waiting for his new machine to be released from Customs, that LOZ was in the process of setting up a printing operation to produce and counterfeit the newly issued $100 note.

25. On February 16, 2014, at approximately 4:23 p.m., an incoming call from (972) 732-4447 (a phone used by LOZ), was intercepted over the cellphone used by Eduard BANGIYEV. Monitors were able to determine from voice recognition that this telephone number is used by LOZ. During this call, Eduard BANGIYEV stated "What's up, what's going on?" LOZ replied "Nothing much, because ah its setup for somebody to pick up the money, you understand, so I called Alex and he told me to speak with you, so I want to speak with you over VIBER, not over the phone." The agents believe that LOZ called Eduard BANGIYEV at the request of Arkadiy BANGIYEV and that they discussed the fact that money (either genuine or counterfeit U.S. currency) was available to pick up. The agents further believe that LOZ wanted to speak to Eduard BANGIYEV over a VIBER account (Voice over IP address) instead of over a telephone, in order to make it difficult for law enforcement to monitor and record their verbal communications.

26. On February 14, 2014, in Mt. Laurel, New Jersey, I, along with other USSS agents, saw a brown 2013 Ford Edge with New York tags GJA 2229 leave the parking lot of the Candlewood Suites at 4000 Crawford Place, Mt. Laurel, New Jersey, around 8:20 a.m. I also observed two white males inside the rental vehicle, who agents positively identified as LOZ and

FAKIRO. I followed the vehicle from the Candlewood Suites to SUBJECT PREMISES #1, where LOZ and FAKIRO entered Suite #18 (the suite number is displayed on the outside wall of the warehouse). SUBJECT PREMISES #1 is a warehouse unit located in an industrial park with multiple adjoining suites. At approximately 6:00 p.m., agents saw LOZ and FAKIRO return to the rental vehicle and leave the warehouse. LOZ and FAKIRO later drove the vehicle back to the Candlewood Suites Hotel, which they entered around 7:25 p.m. Later, that same evening, agents returned to the SUBJECT PREMISES #1 and peered inside the windows of Suite #18. Looking through the windows, the agents observed and photographed the following items located inside: (a) a Vastech V14 Film Processor; (b) a Challenge Industrial Printer; and (3) a stand up air compressor. Based on my training and experience, I know that these pieces of equipment can be used to manufacture counterfeit U.S. currency using the off-set printing process.

27. On February 16, 2014, at approximately 6:00 p.m., a suspicious activity call was reported to the Cherry Hill, New Jersey Police Department (CHPD) in the vicinity of an industrial warehouse on Deer Road, which is a mixed residential and commercial area. The complainant stated that he/she saw movement inside of a brown Ford Edge and it appeared suspicious. Upon arrival at Deer Road, the responding officer noticed that the vehicle was unoccupied. The officer walked across the parking lot to SUBJECT PREMISES #1 to investigate further. After entering, the officer saw men working inside and spoke with a white male who identified himself as Itzhak LOZ, the "owner of the warehouse." LOZ further confirmed to the officer that the car in question was his rental car and he had been in and out of it all day. The officer took no further action after speaking with LOZ inside SUBJECT

PREMISES #1. While inside SUBJECT PREMISES #1, the officer believed that he saw construction material inside.

28. On February 25, 2014, in Cherry Hill, New Jersey, USSS agents observed the delivery of a tractor trailer with a shipping container to SUBJECT PREMISES #1 and observed LOZ and FAKIRO unload several unknown, medium-sized heavy items enclosed in shrink wrap from the truck into SUBJECT PREMISES #1.

29. On February 27, 2014, U.S. CBP records confirmed that the shipping container delivered to SUBJECT PREMISES #1 on February 25, 2014, was loaded in Israel on January 7, 2014 and arrived in New York on January 26, 2014. U.S. Customs officials inspected the container and released it from Customs on February 12, 2014. According to the CBP, the shipping container weighed approximately 55,000 pounds and contained at least one off-set printing press, hand tools and miscellaneous equipment.

30. On March 19, 2014, in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind SUBJECT PREMISES #1. While searching the trash bags in the container, a shipping receipt addressed to "Marker Systems, Customer name RONEN, 620 Deer Rd" was discovered. Also inside that trash bag, were work orders from October of 2006 from Dot Works, a printing company from New York. On the work order, the customer name was listed as "AVI LOV," and the shipping address was Elegant Jewelers, a jewelry store owned by Eduard BANGIYEV in 2006. Also inside the same trash bag were various types of printing plates with wet ink and images of the new $100 bill 3-D security ribbon (bearing a liberty bell and "100s'"), used latex gloves, and film sheets. Three other bags found in that container were filled with shredded materials. Further inspection of the shredded materials revealed that they

were replications of the new $100 bill 3-D security ribbon. Also in the shred were some small pieces of counterfeit $100 bills (from the series prior to the new $100 bill).

31. On March 24, 2014, in Cherry Hill, New Jersey, USSS agents observed LOZ and FAKIRO arrive at SUBJECT PREMISES #1 in a Silver Kia Sorento, with Pennsylvania license plate HWK 5647. Avis/Budget Rent a Car confirmed that on March 24, 2014, in Cherry Hill, New Jersey, the previously rented brown Ford Edge was returned, and the silver Kia Sorento was leased until September 20, 2014, by Ronen FAKIRO, with LOZ listed as a secondary driver.

32. On March 26, 2014, in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind SUBJECT PREMISES #1. While searching the trash bags found in the container, agents discovered a statement from Bank of America for an account held in the names Itzhak LOZ and Ronen FAKIRO with an address of 620 Deer Road, Suite 18 (SUBJECT PREMISES #1). Also inside that trash bag was what appears to be a template for the placement of the 3-D security ribbon on the newly issued $100 bill, along with printing plates, and other items consistent with the use of an offset printing process.

33. On March 26, 2014, in Philadelphia, Pennsylvania, according to U.S. CBP records, Boaz BOROHOV entered the United States at Philadelphia International Airport from Israel, along with Ofra BOROHOV. At approximately 8:25 a.m., in Mount Laurel, New Jersey, USSS agents observed LOZ and FAKIRO exiting the Extended Stay America, with a male and a female subject, later identified by USSS agents as Boaz BOROHOV and Ofra BOROHOV. USSS agents observed LOZ, FAKIRO, Boaz BOROHOV and Ofra BOROHOV enter the silver Kia Sorento and leave the SUBJECT PREMISES #2 parking lot, and later return to the parking lot of the Extended Stay America at approximately 11:21 a.m. The Extended Stay America is located across the street and approximately one tenth of a mile from the Candlewood Suites.

According to Bank of America records, a charge for $1,940.40 was charged to the debit card associated with the joint account held by LOZ and FAKIRO for expenses at SUBJECT PREMISES #2. According to hotel records, the reservation for SUBJECT PREMISES #2 is one room, ROOM 311, for two adults, for a stay from March 26, 2014 through June 24, 2014. The reservation is listed in the name of Itzhak LOZ, 620 [Dier] Rd, Cherry Hill, New Jersey.

34. On March 27, 2014, in Cherry Hill, New Jersey, USSS agents observed LOZ and FAKIRO depart the Candlewood Suites, and pick up Boaz BOROHOV and Ofra BOROHOV at SUBJECT PREMISES #2, and then arrive at SUBJECT PREMISES #1 in the Kia Sorento. All four individuals entered the warehouse. Later in the day, USSS agents observed that both Ofra BOROHOV and Boaz BOROHOV had left the SUBJECT PREMISES #1 with LOZ, and were dropped off at SUBJECT PREMISES #2. Ofra BOROHOV was observed carrying a yellow shopping bag with her into SUBJEC PREMISES #2.

35. On March 28, 2014, USSS agents observed LOZ and FAKIRO pick up both Ofra and Boaz OBROHOV at SUBJECT PREMISES #2. The BOROHOVS entered the vehicle, each carrying a plastic bag.

36. On March 28, 2014, in Cherry Hill, New Jersey, USSS agents observed LOZ and FAKIRO at the Avis/Budget Rent a Car, located at 1422 New Jersey 70, Cherry Hill, New Jersey. LOZ and FAKIRO were observed exiting the store, and entering a red Ford Edge, bearing Pennsylvania license plate JJA 9569.

37. On March 30, 2014, USSS agents observed LOZ, FAKIRO, and Ofra BOROHOV exit SUBJECT PREMISES #1 and enter the red Ford Edge. Boaz BOROHOV was observed coming out of the back of the SUBJECT PREMISES #1 and throwing a large box in the dumpster. Boaz BOROHOV then entered the red Ford Edge, and the vehicle departed.

USSS agents later observed both of the BOROHOVS being dropped off at SUBJECT PREMISES #2, where they entered the hotel carrying four white plastic bags.

38. On March 31, 2014, Avis/Budget confirmed that on March 28, 2014, in Cherry Hill, New Jersey, the Silver Kia Sorento was returned (due to the vehicle not having an EZ Pass), and Avis/Budget Rent A Car replaced it with a red 2014 Ford Edge, bearing Pennsylvania license plate JJA 9569, VIN# FMDK4KC3EBA51195. The Ford Edge was rented in FAKIRO's name and LOZ is listed as an authorized driver.

39. On April 9, 2014, in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind the warehouse located at SUBJECT PREMISES #1. While searching the trash bags found in the container, agents seized what appears to be a template for the placement of the 3-D security ribbon on the newly issued $100 bill; a piece of paper with a 3-D security ribbon; a piece of paper with blue 3-D security ribbon, a security strip with "USA 100," and a watermark of the portrait of Benjamin Franklin. Also inside that trash bag were printing plates and other items consistent with the use of an offset printing process.

40. On April 16, 2014, in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind SUBJECT PREMISES #1. While searching the trash bags in the container, the agents found what appears to be a template for the placement of the 3-D security ribbon on the newly issued $100 bill.

41. On April 23, 2014, in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind the SUBJECT PREMISES #1. While searching the trash bags found in the container, agents seized what appears to be a roll of several hundred templates for the placement of the 3-D security ribbon on the new $100 bill; a water bill in the name of

"Ipzhak Loz", addressed to "620 Deer Rd 18, Cherry Hill, NJ"; several cups filled with blue ink and several shreds of plastic strips with blue Liberty Bells and "100" symbols.

42. On April 24, 2014, in Mt. Laurel and Cherry Hill New Jersey, USSS agents observed Ofra and Boaz BOROHOV exit SUBJECT PREMISES #2, and enter a gray Chevrolet Traverse, bearing Pennsylvania license plate JCC 9839 (herein referred to as SUBJECT VEHICLE #1), and arrive at SUBJECT PREMISES #1. Later that evening, USSS agents observed the BOROHOVS depart SUBJECT PREMISES #1 in SUBJECT VEHICLE #1, and return to SUBJECT PREMISES #2. Avis/Budget rental confirmed this vehicle was entered into a short-term lease through September 3, 2014, in the name of Ronen FAKIRO.

43. On May 5, 2014, in Cherry Hill, New Jersey, USSS agents observed Ofra and Boaz BOROHOV arrive at SUBJECT PREMISES #2 and exit SUBJECT VEHICLE #1. Ofra BOROHOV was observed carrying a yellow plastic bag and a laptop computer into the SUBJECT PREMISES #2.

44. On May 7, 2014, in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind the SUBJECT PREMISES #1. While searching the trash bags found in the container, agents seized what appeared to be several pieces of paper and plastic plate cleaning sheets with blue and red ink on them. The agents also found a container of printing ink from the Royal Dutch Printing Ink Factories.

45. On May 7, 2014, in Philadelphia, Pennsylvania, the USSS conducted surveillance of LOZ and FAKIRO. During this surveillance, at approximately 10:36 a.m., USSS agents observed LOZ and FAKIRO exit Photo Process Screen Manufacturing Company, a printing supply company, and get into the red Ford Edge. The agents observed LOZ carrying a rectangular box and FAKIRO carrying a cylindrical cardboard container carrying packages from

the store. USSS agents followed LOZ and FAKIRO directly to SUBJECT PREMISES #1 and observed LOZ take a rectangular box from the red Ford Edge into SUBJECT PREMISES #1.

46. On May 21, 2014 in Cherry Hill, New Jersey, USSS agents conducted a trash pull of the garbage containers behind the SUBJECT PREMISES #1. While searching the trash bags found in the container, agents seized what appeared to be printing plates with images of red and blue fibers, sheets of paper containing front plate images of $100 bill, and amongst other items consistent with the offset printing process, a FedEx International Air Way bill addressed to Marker Systems, Room 342, Candlewood Suites, Crawford Place, Mt. Laurel, NJ. U.S. CBP records confirmed that on April 30, 2014, Film Optics, LTD, was the originator of the shipment, which contained various plastic film sheets. An additional filing was also discovered by U.S. CBP (dated February 22, 2014), from Pro Line Astek LTD, Nevatim 8, Petah Tikva, IL, addressed to Marker Systems, Room 343,Candlewood, Crawford Place, [Mt.] Laurel, NJ , for a DVR 16CH VICRON security system.

47. On May 21, 2014, I received a copy of an email FAKIRO sent to the management of Candlewood Suites, from the email address ronen@fakiro.co.il, stating "We are leaving the hotel at the end of the month, And we supposed to return at july 26, Fakiro ronen, Marker systems ltd."

48. On May 26, 2014, according to U.S. CBP records, Itzhak LOZ and Ronen FAKIRO booked tickets to Tel Avis, Israel, from JKF International Airport for May 29, 2014.

49. On May 27, 2014, the Candlewood Suites Hotel, 4000 Crawford Place, Mt. Laurel, New Jersey, advised the USSS that Itzhak LOZ and Ronen FAKIRO checked out of their hotel rooms earlier that day.

50. On May 27, 2014, in Mt. Laurel, New Jersey, USSS agents observed LOZ and FAKIRO depart the Candlewood Suites, and drive to SUBJECT PREMISES #1. LOZ and FAKIRO were observed removing several boxes from SUBJECT PREMISES #1, and loading them into the rear of the red Ford Edge. The red Ford Edge departed SUBJECT PREMISES #1 and USSS agents proceeded to follow the vehicle north, into New York where they observed LOZ and FAKIRO go to a Self-Storage facility and remove one box approximately 18 x 24 x 12 and one large blue rolling suitcase from the red Ford Edge and put it into a storage unit.

51. On May 27, 2014, in Mt. Laurel, New Jersey, USSS agents observed Ofra and Boaz BOROHOV enter SUBJECT VEHICLE #1 and leave the parking lot of the Extended Stay America and travel to the SUBJECT PREMISES #1. Based on my knowledge of the investigation, I believe that Ofra and Boaz BOROHOV are still residing in SUBJECT PREMISES #2 and using SUBJECT VEHICLE #1 to travel in.

**ITEMS TO BE SEIZED**

52. Based on my training and experience and information that I have obtained and learned from others experienced in the investigation of manufacturing and selling counterfeit currency, I know the following:

a. that those involved in counterfeit U.S. currency activities commonly maintain equipment, paper, and ink that is used to produce counterfeit U.S. currency;

b. that persons involved in manufacturing and selling counterfeit U.S. currency frequently have additional counterfeit U.S. currency bills stored where they are manufactured or printed, in their residence, and in their vehicles for future deals;

c. that persons involved in selling U.S. counterfeit currency often maintain the proceeds from those transactions in their residences, vehicles and places of employment;

d. that those involved in counterfeit U.S. currency activities commonly maintain addresses or telephone numbers in books, on papers and/or computers/electronic media (including cellular telephones), which reflect the names, addresses and/or telephone numbers of their criminal associates in the organization and customers who purchase their counterfeit bills.

53. Based on my training and experience, I also know that the making of very high quality counterfeit U.S. currency, as seized and purchased during this investigation, can be done by the use of an off-set lithographic printing process. Off-set lithography is still the most commonly and widely used printing technique by commercial printers. This printing process works on a very simple principle that ink and water do not mix. Before the process begins, images (words and/or pictures) must be converted to film and metal or polymer plates. Once the plates are completed, they are dampened first by water and then ink. On the press, the ink is distributed to the plates through a series of rollers. The ink adheres to the image area on the plate and the water to the non-image area. The image is then transferred to a rubber "blanket" and the rubber "blanket" transfers the image onto the paper. The image does not go directly to the paper from the plates. Computers are frequently used in the production of counterfeit currency made using the off-set lithographic process. A counterfeiter can acquire images of Federal Reserve Notes through scanning or photography. Then, photo editing computer software, such as Adobe Photoshop, can be used to edit the image of the Federal Reserve Notes to touch-up any imperfections. Images of Federal Reserve Notes can also be obtained via computer file-sharing,

digital storage devices and the internet. Computer-to-plate devices that burn the image onto a printing plate, without the use of film, are also available. Off-set printing presses and other machinery may also be linked to computers to control their operations and to inspect the printed product. Therefore, I know that evidence of these counterfeiting crimes may be stored on various pieces of computer hardware, computer software, on computer storage media, including cell phones and external drives, CDs and DVDs, computer records, printing equipment, and other printing products.

54. I have spoken with USSS experts in the counterfeiting of U.S. currency and the detection of counterfeit U.S. currency, and the experts have explained that counterfeiters using off-set printing presses would generally have the below listed materials which are routinely used in the printing process of counterfeiting money. The experts have also explained that some of the items listed below maintain a forensic value and that when subject to testing (such as ink analysis, paper origination, fingerprint examination, or linking plates/negatives/images or whole or partial images of Federal Reserve Notes), these items can help reveal the identity of those involved in the production of counterfeit U.S. currency. In addition, some of the items listed below would aid in the identification of other co-conspirators and assist in determining their roles within the criminal enterprise. These items include, but are not limited to:

**Items Routinely Found in Counterfeiting U.S. Currency**

1. Paper – shredded, cut, and uncut;
2. Inks, pigments, and dyes;
3. Brushes and rollers;
4. Stencils and screens;
5. Press cleaning supplies;
6. Embossing devices;
7. Gloves;

8. Plate burners;
9. Hot foil stampers and hot foil stamps;
10. Paper cutters and shredders
11. Glitters;
12. Arts & crafts supplies;
13. Thermographic materials;
14. Adhesive;
15. Metal dies;
16. Foils;
17. Lenticular lens sheets – both cut and uncut;
18. Printing press blankets;
19. Counterfeit detection tools;
20. Receipts and invoices relating to the purchase of supplies, such as paper, ink, toner; service of machinery, transportation of good and items to or from 620 Deer Road, Cherry Hill, New Jersey;
21. Documents and printed material related to the making of genuine US currency or the make-up of genuine US currency;
22. Scissors, cutting tools, cutting boards, registration paper, double sided tape, gloves, oven cleaner solutions and products, chemical de-greaser solutions and products, Scotch-Guard products, "Febreze," starch, irons, and similar items;
23. Printing presses and digital printers;
24. Printing plates;
25. Negatives;
26. Cameras;
27. Scanners;
28. Any material bearing the completed or partial image of a Federal Reserve Note;
29. Any material bearing the completed or partial image of a Federal Reserve Seal;
30. Any material bearing the completed or partial image of a Treasury Seal;
31. Any material bearing the completed or partial image of a serial number;
32. Digital images of currency, plates, printing process;
33. Counterfeit United States and foreign currency in various denominations;
34. Genuine United States and foreign currency in various denominations, which may be compared to known counterfeit currencies in an attempt to identify currency which may have been used as "pattern notes" to produce counterfeit currency;
35. Copier paper, linen résumé paper, cotton bond paper, or materials which could be printed on to produce counterfeit currency; and
36. Any security related or surveillance devices, to include camera systems, DVR's, hard drives, or any other related electronic devices used for monitoring.

55. I know that when an individual uses a computer to store and reproduce financial documents, the computer will generally serve both as an instrumentality for committing the crime, and also as a storage device for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage device for evidence of the crime because individuals involved in such counterfeiting schemes usually maintain records and evidence relating to their crimes on their computers. As such, the evidence obtained during the requested search may provide details regarding the files accessed from the computers, images of United States currency, serial numbers and identifiers of United States currency, and alterations to United States currency, and the identity of other co-conspirators and association evidence between the target subjects and other criminal associates.

56. Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.

**<u>REQUEST TO SEIZE COMPUTERS AND COMPUTER RECORDS</u>**

57. As previously stated, persons engaged in manufacturing counterfeit bills may retain evidence of their crimes on computer media.

58. Based upon my knowledge, training, and experience, your affiant knows that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals, discussed below) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

a. The volume of evidence. Computer storage devices (such as hard disks, diskettes, compact disks, tapes, etc.) can store the equivalent of thousands of pages of information. In addition, a user may seek to conceal evidence of criminal activity by storing it in random order with deceptive file names. Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending upon the volume of data stored, and it would be impractical to attempt this kind of data analysis "on-site."

b. Technical requirements. Analyzing computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know prior to the search which expert possesses sufficient specialized skills to best analyze the system and its data. No matter which system is used, however, data analysis protocols are exacting scientific procedures, designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources and from destructive codes embedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis. Accordingly, as stated above, it is usually necessary that the above-referenced equipment, software, data, and related instructions be seized and subsequently processed by a qualified computer specialist in a laboratory setting. It may be the case, however, that some types of

computer equipment can be more readily analyzed and pertinent data seized on-site, thus eliminating the need for its removal from the premises.

c. It may be necessary for programmers and other outside experts to assist the United States Secret Service during the examination of the computer evidence.

d. When records or evidence are stored on magnetic media such as tape, diskette, hard drive, etc., it is common to find that specific records authorized to be seized are inextricably mixed and without technically difficult or extremely time-consuming procedures are inseparable from other records, programs, or files (similar to a bound-volume book containing financial records, addresses, a diary, and notes for example). Current technology also allows the storage of sounds, images and video "movies" as digital files on a diskette or chip in a recording device, as well as on different formats of magnetic tape. The storage medium containing records or evidence relating to the crime under investigation will be seized for analysis, but only those items authorized to be seized by the warrant will be printed out, disclosed, stored on an evidence disk, or otherwise copied for evidence purposes. Any other items which can be separated out from such evidence will be returned upon completion of the forensic analysis.

59. Based upon my knowledge, training, and experience, your affiant knows that searching computerized information for evidence or instrumentalities of crimes commonly requires agents to seize most or all of a computer systems input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following: the peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other

hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating system, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation, and data security devices. If, after inspecting the I/O devices, software, documentation and data security device, the analyst determines that these items are no longer necessary to retrieve and preserve the data for evidence, the government will return them within a reasonable time. Data analysts may use several different techniques to search electronic data for evidence or instrumentalities of crime. These include, but are not limited to the following: examining file directories and subdirectories for the list of files they contain, "opening" or reading the first few "pages" of selected files to determine their contents, scanning for deleted or hidden data, searching for key words or phrases ("string searches").

## Conclusion

60. Based on the foregoing, I submit that there is probable cause to believe that evidence, fruits, and instrumentalities of counterfeiting U.S. currency, and conspiracy and attempt to commit those offenses, in violation of Title 18, United States Code, Sections 471, 472, 473 and 371 are present in SUBJECT PREMISES #1 (the warehouse), SUBJECT PREMISES #2 (the Extended Stay America, Room 311), and in SUBJECT VEHICLE #1 (the gray Chevrolet Traverse, driven by the BOROHOV's). I request that a search warrant be issued, authorizing me and other law enforcement officers to search the SUBJECT PREMISES 1 and SUBJECT PREMISES 2, and SUBJECT VEHICLE #1, as described in Attachments A1-A3, for the items

listed in Attachment B.

61. I request that affidavit and the accompanying application be placed under seal. This is necessary to protect the integrity of the ongoing investigation. Premature disclosure of the contents of this affidavit would frustrate this investigation by immediately alerting the subjects of the investigation to the nature of the government's investigation, the techniques employed and the evidence developed to date, and to the identities of those providing information to the government.

I affirm under penalty of perjury that the facts and circumstances described in this affidavit are true and accurate to the best of my knowledge and belief.